IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM R. FERNANDEZ, | No. CIV S-04-0442-MCE-CMK-P |
| Petitioner, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| D. RUNNELS, | |
| Respondent. | |
| _____/ | |

Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court is petitioner's petition for a writ of habeas corpus (Doc. 1), filed on March 4, 2004, respondent's answer (Doc. 7), filed on August 13, 2004, and petitioner's reply (Doc. 10), filed on September 9. 2004.[1]

/ / /

/ / /

/ / /

---

[1] On January 28, 2005, the court issued an order deeming this case related to Romero v. Runnels, CIV S-04-0459-MCE-CMK.  Proceedings in the related case are currently being held in abeyance pending exhaustion of claims in state court.  The related case order does not preclude resolution of the cases separately.

1

# I. BACKGROUND

**A.     Facts**[2]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> The trial testimony, viewed in the light most favorable to the judgment, established the following facts. On January 28, 1999, two men kicked in the door of an apartment in the Southwood Estates apartment complex in Vacaville, where Cory Bonifacio and Ann Winston lived with their two children. Both Bonifacio and Winston and their children were home when the two men entered. Pepper, their two-year-old Rottweiler dog, was also in the house. One man, later identified as defendant Romero, wore a mask and carried a gun. The other man, later identified ad defendant Fernandez, was not wearing a mask and was carrying a lead pipe.
>     Once in the kitchen of the apartment, Fernandez told Winston to get on the floor. Romero pointed his gun at the children and demanded money. He said, "[I]f you don't give me money, I will shoot your kids." When Bonifacio heard the noise, he came down to the kitchen. Romero pointed the gun at him and ordered him to get on the ground. In spite of the mask, Bonifacio immediately recognized Romero from his eyes, chin, and voice, having seen him twice before. Winston also recognized Romero's voice from a prior conversation she had with him in the neighborhood.
>     Once Bonifacio was on the ground in the kitchen, Fernandez hit him with his fist, and struck the dog in the head with the pipe. At some point, Fernandez pulled a gun out of his fanny pack and pointed it at Bonifacio, demanding that he give him money. Bonifacio took about $150 out of his pocket and Romero grabbed it.
>     Romero ran out of the door and Pepper chased after him. Fernandez also fled, but paused at the front door as if he were putting something into his fanny pack. When he paused, Bonifacio tackled him. While Bonifacio and Fernandez fought, Pepper had Romero pinned to the ground about 10 to 15 feet away. Romero's mask came off in the struggle and Fernandez [sic] clearly saw his face. Romero ran away with Pepper chasing him and Fernandez ran after them once he got away from Bonifacio. After defendants ran away, Winston and Bonifacio heard a single gun shot, and later they found Pepper dead with a gunshot wound in her chest. Winston and Bonifacio later identified Romero and Fernandez in photographic lineups.

---

[2]     Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

    Fernandez's wife, Gloria, eventually helped the police locate Fernandez and Romero in Colorado.  Gloria testified that on January 26 she had rented Fernandez a U-Haul so he and Romero could move to Colorado where Fernandez's daughter, Desiree, lived.  She and Fernandez had fought over the move, and that night she was arrested for domestic violence.  When she was arraigned on January 28, Fernandez and Romero were present in the courtroom.  By the time she was released that evening, however, Fernandez and Romero were gone and had taken all of her furniture.  Gloria reported the theft to the police.

    Rosie Aguayo, who had traveled with Romero and Fernandez to Colorado, testified that prior to leaving California, the U-Haul stopped at the Southwood Apartment Complex and Fernandez got out to see a friend.  After about five minutes, she heard a noise that sounded like a backfire and then she heard a dog yelping.  Shortly thereafter the U-Haul departed.  They arrived in Colorado two days later.

    Investigators arrested Fernandez and Romero in Colorado and executed a search warrant for Desiree's house.  The search turned up clothing that matched the descriptions of the clothing worn by the robbers on January 28th.  Desiree testified at trial that the clothes seized from her house belonged to her.  She also testified that Romero and Fernandez arrived at her house at about 11:00 p.m. during her anniversary party.  She said her wedding anniversary is on January 28th.  Gloria, however, testified that the anniversary, as recorded in her date book, is actually on January 30th.

Fernandez and Romero are father and son, respectively.

  **B.**  **<u>Procedural History</u>**

  The state court recited the following procedural history through direct appeal:

    Defendants Romero and Fernandes were charged by an amended information with first degree residential burglary in count one . . .; first degree residential robbery in counts two and three . . .; assault with a semiautomatic firearm in counts four, five, six, and seven . . .; and cruelty to an animal in count eight . . . .  The amended information also alleged that both defendants used a firearm in the commission of the offenses . . .; that a principal in each of the above offenses was armed with a firearm. . .; and that Romero personally and intentionally discharged a firearm in the commission of the robbery. . . .  On June 16, 2000, a jury found defendants guilty as charged.  The jury found true all the firearm enhancement allegations against Romero, but found true only those enhancement allegations against Fernandez that did not require him to have been personally armed with a firearm.  Defendants each filed a motion for a new trial that was denied.

    Romero was sentenced to a total of 38 years in prison.  The trial court sentenced him to the midterm of four years for first degree robbery, the midterm of two years for each of the four counts for assault with a semiautomatic firearm, and the midterm of eight months for cruelty to an animal.  He was sentenced to an additional 25 years, 4 months for the

> firearm enhancements.  Sentencing on all other counts and enhancement allegations was stayed . . . .
>
> Fernandez was sentenced to a total prison term of 18 years.  The trial court sentenced him to the midterm of one year four months for first degree robbery, the upper term of nine years for one count of assault with a semiautomatic firearm, the midterm of two years for each of the remaining three counts of assault . . ., and the midterm of eight months for cruelty to an animal.  He was sentenced to an additional one year for the firearm enhancements.  Sentencing on all other counts and enhancement allegations was stayed . . . .

On direct appeal, petitioner's conviction and sentence were affirmed in an unpublished reasoned decision issued on November 18, 2002.  Petitioner's request for direct review by the California Supreme Court was denied on February 11, 2003, without comment or citation.  Petitioner did not seek post-conviction relief in the state courts.

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  For instance, when the state court reaches a decision on the merits, but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether the state court clearly erred in its application of Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  Similarly, when it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that,

where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner). When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

Where the AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

Under § 2254(d), federal habeas relief is available where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme

1  Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See
2  id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to
3  determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,
4  1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which
5  case federal habeas relief is warranted.  See id.  If the error was not structural, the final question
6  is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

    A state court decision is reviewed under the far more deferential "unreasonable
8  application of" standard where it identifies the correct legal rule from Supreme Court cases, but
9  unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,
10 123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,
11 suggested that federal habeas relief may be available under this standard where the state court
12 either unreasonably extends a legal principle to a new context where it should not apply, or
13 unreasonably refuses to extend that principle to a new context where it should apply.  See
14 Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court
15 decision is not an "unreasonable application of" controlling law simply because it is an
16 erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade,
17 123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot be found
18 even where the federal habeas court concludes that the state court decision is clearly erroneous.
19 See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to give proper
20 deference to state courts by conflating error (even clear error) with unreasonableness."  Id.  As
21 with state court decisions which are "contrary to" established federal law, where a state court
22 decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless
23 unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.
24 / / /
25 / / /
26 / / /

### III.  DISCUSSION

Petitioner raises the following claims: (1) the trial court erred by denying his motion for a new trial based on juror misconduct; (2) the trial court erred in limiting CALJIC Nos. 2.01 and 2.02 to circumstantial evidence; and (3) the trial court erred in instructing the jury pursuant to CALJIC No. 2.27.  Respondent concedes these claims are exhausted.

### A. Juror Misconduct Claim

Petitioner contends that the juror who eventually served as the foreperson concealed during voir dire that her father-in-law had been the police chief of Fairfield, and that she had been friends with an elderly woman who had been murdered in a home invasion robbery. This information was presented to the trial court in the form of a declaration from petitioner's attorney filed in support of petitioner's motion for a new trial.

The Sixth Amendment guarantees a fair trial by an impartial jury.  See Irvin v. Dowd, 366 U.S. 717, 722 (1961); Tinsley v. Borg, 895 F.2d 520, 523 (9th Cir.1990).  If even a single juror is "unduly biased or prejudiced" the defendant has been denied his right to an impartial jury.  See Tinsley, 895 F.2d at 523-24.  To establish misconduct in the context of failing to answer voir dire questions, petitioner must demonstrate that the juror failed to answer honestly, and that a correct response would have provided a basis for a challenge for cause. See McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); Tinsley, 895 F.2d at 524.  While the motives for concealing information may vary, only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial.  See id.  Forgetfulness does not indicate lack of impartiality.  See United States v. Edmond, 43 F.3d 472, 473-73 (9th Cir. 1994).

However, not every incident of juror misconduct or bias requires a new trial.  See United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974).  "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." Id. On collateral review, if misconduct occurred, a petitioner must show that the alleged error "'had

substantial and injurious effect or influence in determining the jury's verdict.'" <u>Jeffries v. Blodgett</u>, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)); <u>see also</u> <u>Hughes v. Borg</u>, 898 F.2d 695, 699 (1990).

In addressing this claim, the state court stated:

> Prejudicial jury misconduct constitutes grounds for a new trial. "When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible under [California] Evidence Code section 1150(a). If the evidence is admissible, the court must then consider whether the facts establish misconduct. Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial." (citations omitted). "Intentional concealment of relevant facts or the giving of false answers by a juror during the voir dire examination constitutes misconduct, and the occurrence of such misconduct raises a rebuttable presumption of prejudice." (citation omitted). To determine whether the concealment gives rise to a presumption of prejudice, the trial court must "determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited." (citation omitted). "The presumption of prejudice created by the misconduct may be rebutted by '". . . an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct."'" (citations omitted).
>
> * * *
>
> Initially, it is necessary to comment on the strength of defendant's showing. The People do not directly challenge the admissibility of counsel's declaration, presumably recognizing that the prosecution's failure to object to the competency of counsel's declaration in the trial court waived any challenge to its admissibility on appeal. (citation omitted). They do, however, fault defendants for not submitting a declaration from Juror No. 9, and point out that in the absence of such a declaration, we are not required to assume the truth of counsel's statements. Regardless of the prosecutor's failure to object to the declaration, the trial court had an independent obligation to carefully "examine the proffered basis for the new trial motion and determine whether credible and admissible evidence substantiates the underlying allegations." (citation omitted). Thus, the trial court could consider the absence of any foundation when evaluating the credibility of the declaration. The declaration fails to identify how counsel came to know the information he relates, leaving the trial court to resolve the motion based only upon unexplained allegations of defense counsel concerning matters about which he undoubtedly had no direct knowledge.

8

Question number 11 on the juror questionnaire asked whether "a close friend or relative had been a victim of a crime?" Defendants submit that in response to this question Juror No. 9 intentionally concealed that she was a friend of Dorothy Stone, an 85-year-old neighbor who lived across the street from her father-in-law and who had been killed during a brutal home invasion robbery. The People argue that the allegedly concealed information was not responsive to the question asked during voir dire and that counsel's declaration does not establish that Juror No. 9 had knowledge of the allegedly concealed facts. Unfortunately, the People attempt to discredit defendants' showing by arguing that the concealed information was not responsive to a question that asked about a "friend/or relative being involved in a criminal case." Clearly, however, the People focus on the wrong question, and as a result never respond to defendants' actual argument that Juror No. 9 denied knowing the victim of a crime, a separate and distinct voir dire question. Nonetheless, it is not at all clear that the allegedly concealed friendship was responsive to question number 11. The term "close friend" has no precise meaning, and the neighbor of one's father-in-law is not necessarily a close friend. If the attorney's declaration was correct that Juror No. 9 invited Ms. Stone to her wedding, this would provide some evidence of their relationship, but it would hardly be conclusive of a "close" friendship. Likewise, because the declaration does not indicate when Juror No. 9 was married or when the crime occurred, it is impossible to evaluate the depth of that relationship or the likelihood that the two remained in close contact prior to Ms. Stone's murder. Finally, while one might infer that Juror No. 9 had knowledge of the crime because the declaration recites it was widely publicized, that too is hardly conclusive. Because the declaration does not provide the source of the declarant's assertion that Juror No. 9 knew of the crime, the trial court was unable to weight the reliability of that assertion. Accordingly, in light of the questionable value of the declaration before the court, the trial judge could reasonably conclude that there was insufficient evidence to justify a finding of misconduct.

Defendants' second contention suffers from similar defects. Juror No. 9 was asked whether "a friend or relative . . . is employed in the law enforcement capacity?" She responded that her sister is in the border patrol and a family friend is in the Vacaville Police Department. Defendants assert that this answer improperly concealed her father-in-law's prior employment with the Fairfield Police Department, demonstrating a bias in favor of law enforcement. The question, however, was asked in the present tense, so that the juror's failure to mention her father-in-law's former position as police chief did not render her answer literally wrong or incomplete. Even if this information should have been revealed, the juror's failure to mention it cannot realistically be regarded as indicative of bias in light of her disclosure of two other relationships with currently active law enforcement personnel and the additional disclosure that she had dinner the night before with a member of the Vacaville Police Department, the agency that investigated the crime being tried. Additionally, Juror No. 9 was asked and confirmed that she would not give greater weight to the testimony of police officers.

///

Because the state court concluded that there was an insufficient evidentiary showing to establish misconduct, it did not reach the question of whether petitioner was prejudiced. Based on the state court's recitation of the applicable law, the court concludes that it applied the correct federal legal rules and, therefore, will review under the more deferential "unreasonable application of" standard.[3]

In his pro se petition, petitioner asserts that the state court's analysis is flawed because it did not take into account other questions asked of other jurors, which all jurors had been instructed to answer if applicable. Petitioner states:

> During voire dire, court and counsel repeatedly explained that the types of questions asked of one member of the venire pertained to all members of the venire, both those in the jury box and those in the courtroom who may be called. [sic].

Petitioner concludes that, because other questions asked during voir dire sought responses concerning <u>any</u> encounters with law enforcement, positive or negative, and <u>past</u> relationships with law enforcement, Juror No. 9 necessarily concealed information by not disclosing her knowledge of Ms. Stone's murder and her father-in-law's past employment as police chief. In this regard, respondent notes that, when Juror No. 9 was called to the jury box for voir dire, she was asked by the court whether she heard the questions asked of prior prospective jurors, to which Juror No. 9 responded that she had. When asked whether she wished to respond to any of those questions, Juror No. 9 said "No."

Assuming that petitioner is correct and Juror No. 9 should have disclosed her knowledge of Ms. Stone's murder and her father-in-law's past employment because other questions asked before Juror No. 9 entered the jury box sought such information, there is no

---

[3] In particular, consistent with the applicable federal law, the state court stated that, if there was misconduct, "the court must determine whether the misconduct was prejudicial."
   The court notes that respondent appears to analyze the state court's decision under the "contrary to" standard. Specifically, respondent states: "The California Court of Appeal's rejection of petitioner's claim of juror misconduct was not contrary to clearly established Supreme Court authority."

10

evidence that Juror No. 9 failed to disclose the information for any reason which would reflect negatively on her ability to be impartial. For example, there is no evidence that Juror No. 9 intentionally concealed the information in order to get on the jury and then vote for conviction. Moreover, even though Juror No. 9 had current relationships with law enforcement personnel, she nonetheless assured the trial court that she could be fair and impartial and that she would not automatically give more weight to the testimony of a police officer. Therefore, disclosure of information concerning Ms. Stone's murder and her father-in-law's prior employment would not have provided cause for a challenge to Juror No. 9.

Based on the foregoing, the court finds that the state court's conclusion that no misconduct had been established is neither an unreasonable application of federal law nor contrary to federal law. Under either standard of review, petitioner's claim should be denied.

### B. Jury Instruction Claims

Petitioner challenges the trial court's instructions pursuant to CALJIC Nos. 2.01, 2.02, and 2.27. A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. See Milton v. Wainwright, 407 U.S. 371, 377 (1972). Thus, a challenge to jury instructions does not generally give rise to a federal constitutional claim. See Middleton, 768 F.2d at 1085) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

1 Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a
2 claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete
3 miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396
4 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).
5         In general, to warrant federal habeas relief, a challenged jury instruction "cannot
6 be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due
7 process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317
8 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner
9 must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting
10 conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,
11 414 U.S. at 147).  In making its determination, this court must evaluate the challenged jury
12 instructions "'in the context of the overall charge to the jury as a component of the entire trial
13 process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.
14 1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire
15 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a
16 way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494
17 U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an
18 instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).
19         It is well-established that the burden is on the prosecution to prove each and every
20 element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364
21 (1970).  Therefore, due process is violated by jury instructions which use mandatory
22 presumptions to relieve the prosecution's burden of proof on any element of the crime charged.
23 See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510
24 (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed
25 fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a
26 permissive presumption allows, but does not require, the trier of fact to infer an elemental fact

from proof of a basic fact. See County Court of Ulster County v. Allen, 442 U.S. 140, 157 (1979). The ultimate test of the constitutionality of any presumption remains constant – the instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced by the government, to find the ultimate facts beyond a reasonable doubt. See id. at 156 (citing In re Winship, 397 U.S. at 364).

      1.      CALJIC Nos. 2.01 and 2.02

The trial court instructed the jury pursuant to CALJIC No. 2.01 as follows:

> [A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime, but, two, cannot be reconciled with any other rational conclusion. Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proven beyond a reasonable doubt.
> Also, if the circumstantial evidence as to any particular count permits two reasonable interpretations one that point to the defendant's guilt and the other to his innocence, you must adopt that interpretation that points to the defendant's innocence and reject that interpretation which points to his guilt.
> If, on the other hand, one interpretation of this evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

The court also instructed the jury pursuant to CALJIC No. 2.02:

> The specific intent with which an act is done may be shown by the circumstances surrounding the commission of the act. However you may not find the defendants guilty of the crimes charged in Counts 1, 2, and 3 unless the proved circumstances are not only consistent with the theory the defendant had the required specific intent, but cannot be reconciled with any other rational conclusion.
> Also, if the evidence as to any specific intent permits two reasonable interpretations, one of which points to the existence of the specific intent and the other to its absence, you must adopt that interpretation which points to its absence.
> If, on the other hand, one interpretation of the evidence as to specific intent appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

1   In addressing petitioner's claim concerning these jury instructions, the state court stated:

> Defendants contend that the trial court erred in limiting to circumstantial evidence the principle that if evidence is susceptible to two reasonable interpretations, then the jury must reject the interpretation that points to defendants' guilt.  Defendants argue that this general principle is applicable to direct evidence as well as circumstantial evidence and that CALJIC Nos. 2.01 and 2.02 improperly limit its application to circumstantial evidence only.  Defendants' argument lacks merit.
>
> First, CALJIC Nos. 2.01 and 2.02 apply only to circumstantial evidence and, in fact, should not be given where the prosecution relies primarily on direct evidence of a defendant's guilt.  (citation omitted).  Moreover, an additional instruction applying the principle contained in CALJIC Nos. 2.01 and 2.02 to direct evidence would make no sense.  Direct evidence "means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact."  (citation omitted).  There is no room for inference or interpretation of direct evidence warranting an instruction that the defendant should be given the benefit of any reasonable interpretation that points to his or her innocence.  Accordingly, the trial court did not err in this regard.

The state court did not directly address whether CALJIC Nos. 2.01 and 2.02 reduce the prosecution's burden of proof.  While it indirectly did so by holding these instructions would not make any logical sense in the context of direct evidence, the state court did not explicitly address the issue.  Therefore, this court will review de novo.

First, as the state court observes, there is no logical room for the concept embodied in CALJIC Nos. 2.01 and 2.02 in the context of direct evidence because such evidence is not susceptible to inference or differing interpretations.  It is what it is – evidence directly establishing a fact.  Therefore, it cannot be said that limiting the concept to circumstantial evidence – where is makes sense logically – reduced the prosecution's burden of proof on any essential element of a charged offense.  Second, other instructions given at the trial make clear that the jury understood its obligation to find guilt beyond a reasonable doubt and that the prosecution carried the burden of proof.  Specifically, the trial court instructed the jury as follows:

> A defendant in a criminal action is presumed to be innocent until the contrary is proved.  And in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty.  This

presumption places upon the People the burden of proving him guilty beyond a reasonable doubt.

For these reasons, the court concludes that there was no constitutional error with respect to the trial court's instructions pursuant to CALJIC Nos. 2.01 or 2.01.

2.   CALJIC No. 2.27

In addressing petitioner's claim as to this instruction, the state court stated:

> CALJIC No. 2.27 reads as follows: "You should give the [uncorroborated] testimony of a single witness whatever weight you think it deserves. Testimony by one witness which you believe concerning any fact [whose testimony about that fact does not require corroboration] is sufficient for the proof of that fact. You should carefully review all the evidence upon which the proof of that fact depends." The court instructed the jury with CALJIC No. 2.27 in full. The Use Note to CALJIC No. 2.27 provides that the bracketed phrases should be used when "corroboration of witness's testimony is required, such as in [perjury cases]. . . . None of the charged crimes or defendants in this case required corroboration, but the trial court nonetheless included the bracketed phrases in the instruction.
> Defendants content that the trial court erred because the references to corroboration in the instruction misled the jury to believe that "they should 'carefully review' the testimony of a single witness and could find it insufficient if 'uncorroborated.'" Defendants assert that this error was prejudicial because only one witness testified that defendants were in Colorado on January 28, 1999, the day that the crimes were committed in California.
> Arguably, the trial court should have eliminated the bracketed language from this instruction. There is, however, no indication in the record that the jury had any questions regarding whether the testimony of any witness in this case required corroboration. Absent a requirement for corroboration, the instruction merely tells the jury that a single witness's testimony is sufficient if believed, and that they should consider the evidence in support of that testimony carefully. The possibility that the jury was confused by this instruction is remote, and it is even less likely that any prejudice arose from the potential confusion. Desiree's testimony that defendants arrived in Colorado on her anniversary conflicted with Gloria's testimony that defendants were in California on the morning of the 28th and is inconsistent with the victims' identification of Fernandez and Romero as the two men who broke into their home. Thus, it is likely that the jury rejected Desiree's testimony, not because it was uncorroborated, but because it was in conflict with the credible testimony of three other witnesses. Accordingly, it is not reasonably probable that the jury would have reached a result more favorable to defendants had the bracketed portions of the instruction been deleted.

1  While the state court concluded that the jury was probably not confused by CALJIC No. 2.27, as
2  given, it did not specifically address whether the instruction reduced the prosecution's burden on
3  an essential element.  Therefore, as with CALJIC Nos. 2.01 and 2.02, this court reviews de novo.
4       The state court is correct.  There was no testimony in this case which required
5  corroboration.  Therefore, there could have been no reasonable chance of jury confusion.
6  Further, there is nothing in the instruction which could arguably reduce the prosecution's burden
7  on an essential element.  For these reasons, the court concludes that petitioner's claim lacks
8  merit.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus be denied and the Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  October 19, 2006.

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE